THE PEOPLE OF THE STATE OF NEW YORK, on the Complaint of HARRY WINIKOFF, Respondent, *v.* SWIFT AND COMPANY (INC.), Appellant.

Second Department, March 3, 1941.

*Albert L. Stark*, for the appellant.

*Fred Iscol* [*Paxton Blair* with him on the brief], for the respondent.

JOHNSTON, J. The information alleges that defendant " did unlawfully have, keep and offer for sale a quantity of food, to wit: about one hundred and twenty (120) pounds of poultry, for use as human food which was not then healthy, fresh, sound, wholesome and safe for human food in that said poultry was covered with white, green and black mold."

Section 163 of the Sanitary Code of the City of New York, so far as material, provides: " No meat * * * not being then healthy, fresh, sound, wholesome or safe for human food * * * shall be brought into the City of New York or held, kept, offered for sale or sold as such food or kept or stored anywhere in the said City. * * * The term ' meat ' as used herein shall include * * * fowl. * * .*."

Defendant, a wholesale dealer in food, conducts its business in a three-story and basement building. The main, or street floor, is used as a salesroom and the basement as a storage room. The salesroom is in fact a large ice box or ice room. The basement is divided into two sections, one of which is used for the storage of butter, cheese and eggs, and the other for the storage of frozen poultry, which is kept in a cooler. The court found that the storage room is used exclusively by defendant's employees, is kept under lock and key and is not used for the purpose of sales; nor is it accessible to customers. The poultry delivered to defendant's premises is packed in boxes. Each box, which contains twelve chickens and weighs approximately forty-five pounds, is made secure with a hook and wire. The poultry is delivered to the basement in refrigerated cars and before it is sold it is inspected three different times by the defendant. The first inspection takes place upon the arrival of the poultry and before it is placed in the cooler. When a shipment is received the poultry is classified for size, quality and color. The wires are removed from three to five boxes of each classification, the boxes are opened, the paper covering taken out and the birds examined. If anything looks suspicious all the birds are taken from the box and if any are unwholesome they are destroyed. If the birds appear sound the covers are put back and the lot is then placed in the cooler. When poultry is required on the sales floor, twenty or twenty-five boxes are requisitioned from the cooler, three to five boxes are opened and

the contents examined in the storage room for the second time; and if they appear to be sound the lot is sent to the salesroom. Before the poultry is sold every box is opened in the presence of the customer and the contents examined for the third time, in this instance both by the defendant's salesman and the customer. Each bird is removed from the box only when they " look as if they are in any way off condition."

On November 15, 1939, two inspectors from the department of health visited defendant's premises. They examined the poultry in the salesroom and found it to be wholesome. Upon being informed that there was poultry in the storage room, they proceeded to the basement, where they found between 100 and 125 boxes, or approximately 6,000 pounds of poultry in the cooler, which was a smaller quantity than was in the salesroom. They inspected 20 boxes of the lot and found 22 chickens, weighing about 120 pounds, which concededly were unwholesome. There was no box in which all the chickens were unsound. The court found that, while no sale of any of the merchandise was consummated, the poultry in the cooler " eventually is in fact sold unless and until it is found to be unwholesome and its further progress into public food channels is intercepted as a result of its condemnation either by the defendant itself or, as in this case, by the representative of the Department of Health." The court held that the merchandise in the cooler was being kept for sale within the meaning of the ordinance, and found the defendant guilty.

In our opinion, particularly in the light of the recent holding in *People* v. *Wallace & Company* (282 N. Y. 417), the judgment must be reversed. There the defendant was charged with a violation of section 163 of the Sanitary Code upon an information similar to that in the instant case. The inspector found in the storeroom of defendant's factory twelve cans which were swollen and bulging and contained grapes that had become unwholesome. Defendant was a manufacturer of candy and it made no use of the foodstuffs kept under lock and key in its storeroom without first inspecting them, and any article found on inspection not to be wholesome was put aside. The court, in reversing the judgment of conviction and dismissing the information, pointed out that the trial court in effect held defendant's possession of the cans was in good faith and not with intent to use or sell the contents should inspection disclose an unwholesome condition. Judge Loughran then stated (p. 419): " On this record, then, the judgment of guilt must mean that the defendant's mere possession of the containers made it answerable as for a crime once the ensealed grapes became unwholesome. The argument of the Corporation Counsel takes the case that way and,

indeed, the broad text of section 163 — that no unwholesome food shall be ' kept or stored anywhere in the said City '— appears to go a long distance in that direction.   But a penal statute is not necessarily to be liberally applied in all circumstances.   ' For the rule that penal statutes are to be construed strictly something may be said.   When acts are to be made penal and are to be visited with loss or impairment of life, liberty, or property, it may well be argued that political liberty requires clear and exact definition of the offense.'   (Pound, 21 Harvard Law Rev. 383, 387.   See *People* v. *Shakun*, 251 N. Y. 107.)   It is our best judgment that no considerations of expediency require such unfairness as would result were section 163 of the Sanitary Code to be so freely construed as to force its application to the facts which in this case were found below.   (Cf. *People* v. *Kibler*, 106 N. Y. 321.) ''

The *Wallace* case is authority for the proposition that possession alone, without intent to sell unwholesome food, is not a violation of the ordinance.   In the instant case there can be no doubt of appellant's good faith.   It inspected the merchandise three times before it was offered for sale and, upon inspection, any poultry found unwholesome was destroyed.   It is true, as the court found, that the poultry in the cooler was intended " eventually " to be sold, but it is equally true, and the court also found, that it was not to be sold if it had been found by the defendant to be unwholesome. This was tantamount to a holding that the defendant acted in good faith.

In our opinion defendant made an honest effort to ascertain if the poultry was unwholesome and did not intend to sell it if inspection disclosed it was unsound; and as the court found no sale was consummated, the judgment should be reversed on the law, the information dismissed and the fine remitted.

CARSWELL, ADEL and CLOSE, JJ., concur; LAZANSKY, P. J., concurs for reversal, but dissents from the dismissal of the information and the remission of the fine, and votes to order a new trial, with opinion.

LAZANSKY, P. J. (dissenting.)   I concur to the extent that the judgment should be reversed, but dissent as to the dismissal of the information and remission of the fine, and vote for a new trial.

The able and experienced city magistrate, holding a Court of Special Sessions, found that the " inspection " made by defendant was not an inspection at all.   By that he undoubtedly meant that the defendant's " inspection " was highly superficial and inadequate.   I agree with him.

Defendant receives in its place of business in cases, each containing twelve frozen and " non visterated " chickens, lots or classes numbering from fifty to one hundred, sometimes four hundred cases, which are placed in a storeroom or cooler. Out of such lots as they are received, three to five cases are inspected by examining the tops or breasts of the chickens as they lie in the case. But neither the sides (called hips), nor the part lying on the bottom of the cases, which will be called " the backs," is examined. From the cooler they are taken to the salesroom for later, or sometimes for immediate, sale. Before being taken to the salesroom, they are examined in the same way as when received. Only the tops or breasts of the chickens in three to five cases out of each twenty to twenty-five cases are inspected. When an actual sale is being made in the salesroom, only the tops or breasts of the contents of each case are once again examined, this time both by customer and salesman. If, perchance, the top or breast of the chicken discloses a foul condition, then all parts of the twelve chickens in the case are examined and, if found unwholesome, they are not sold. In no instance of the three examinations, which defendant claims it makes, is there a full examination unless the top shows defects. If the top be in good condition, yet the sides or hips or " the backs " are in bad condition, the goods are nevertheless sold. So it was when the examination was made in the cooler by the inspectors of the health department. Defendant's only witness testified that the poultry condemned by the inspectors was " off condition," but " it was on the hips, not on the breast of the chickens; that we can't see it. * * * This mold showed on the hips, didn't show on the breast." He also said that if there was poultry bad on the bottom (" the backs "), it would go out of the place on sale in such condition, " unknown to us." The sum and substance of the testimony of this witness for defendant is that if " inspections " made by defendant do not show on the tops or breasts " something suspicious," the case of chickens is sold even if the sides or hips or " the backs " are in a condition unfit for human consumption. There can be little doubt that such procedure opens the door of opportunity for the sale of countless thousands of pounds of unwholesome food. In marketing large quantities of frozen food of this type, it is fair to assume that each case cannot be opened and each chicken separately examined. But here, as in the handling of other foods, there must be observed a rule of fair average inspection, which would at once not be unreasonable to commercial interests and yet would satisfy reasonable regulations necessarily adopted for the protection of public health, which is of more importance than trade advantage. The testimony

referred to clearly shows that the examinations made by defendant were not reasonably likely to disclose the real condition of the poultry held for sale. Inspection much more stringent than that made by this defendant would afford a greater liberality to the handlers of such food than does the Agriculture and Markets Law to those who handle milk. Mere possession of adulterated milk is a violation of the law. (*People* v. *Kibler*, 106 N. Y. 321; *People* v. *Bowen*, 182 id. 1.)

In my opinion, these goods were being held for sale by defendant. Although sales were not generally made directly from the cooler, they were held there for sale, to be transferred to the salesroom, subject to the two inspections above referred to, each of which is inadequate to show the true conditions. In *People* v. *Wallace & Company* (282 N. Y. 417) the information was dismissed by the Court of Appeals because it was held that there was no intent on defendant's part to violate the Sanitary Code, based on the finding of the trial court that defendant would not use the canned goods if, on inspection, they were found to be unwholesome. Here the goods had already been examined by defendant and, despite their defective condition, would have been delivered to a customer. However, wrongful intent is essential to a finding of guilt. The magistrate did not directly consider that phase of the case. He inferred that intent from the inadequate inspection. It appears that defendant had been following the procedure above stated for fifteen years, and there was testimony given in its behalf that the procedure adopted by it was according to trade custom. This does not establish the sufficiency of the inspection, but may indicate absence of bad faith. There was no proof of prior violations. Therefore, there should be a new trial to determine the question of intent. The procedure of defendant and the alleged custom may then be considered in light of other experiences of defendant with the authorities as to prior violations by defendant of section 163 of the Sanitary Code which may have taken place, as suggested by discussions at the end of the trial.

Judgment of a city magistrate, holding a Court of Special Sessions of the City of New York, Borough of Brooklyn, convicting defendant of a violation of section 163 of the Sanitary Code of the City of New York, reversed on the law, information dismissed, and the fine remitted.